UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

ALPHONSO M. DIGGS,

                Petitioner,

                                                **Hon. Hugh B. Scott**

                v.                                 06CV584S

                                              **Report**
                                                **&**
HON. ELIOT SPITZER,                             **Recommendation**
JAMES CONWAY,

                Respondents.

      Petitioner has filed an application to this Court for habeas corpus relief pursuant to 28 U.S.C. § 2254 challenging his state court conviction (Docket Nos. 1, 4 (Amended Petition)). He asserts the following grounds in support of his Amended Petition: unduly suggestive photo array and unduly suggestive lineup identification of petitioner[1]. This case was referred to the undersigned to render a Report & Recommendation on May 10, 2007 (Docket No. 12).

## BACKGROUND

      This case stems from a January 14, 2002, robbery of the Fleet Bank in Niagara Falls, New York (see Docket No. 4, Am. Pet., at 1). On that date, a black man (wearing a black coat, a pull-over hood, a red bandana over his forehead, and bandage on his nose) entered the Fleet Bank and demanded money from the tellers. One teller gave him about $3,000, and petitioner escaped

---

[1] Petitioner initially raised denial of fair trial, due process, ineffective assistance of counsel regarding prosecutorial misconduct during petitioner's testimony claims, Docket No. 1, but those claims were not exhausted in the state courts, see Docket Nos. 3, 5.

(Trial Tr. at 279-80). The Niagara Falls police interviewed tellers Cherrie Massaro, Darlene Richard, and Carmelita Martin, and they later gave descriptions that formed a composite sketch of the suspect (Docket No. 4, Judicial Hearing Officer Report at second unnumbered page).

The police got a tip from a cab driver who said that he dropped a man off at a motel fitting petitioner's description (Trial Tr. at 380-81, 386, 394). Thereafter, the police went to the motel where petitioner was hiding with a woman and arrested him on January 17, 2002. Upon the officers' arrival, the petitioner instructed the woman not to open the door; then he attempted to avoid capture by escaping through a sunroof (Trial Tr. at 418, 468). Petitioner was arrested and charged with robbery and obstruction of government administration (in attempting to evade apprehension).

*Pretrial Proceedings–The Photo Array*

After his arrest, petitioner was processed and photographed, and when booked he said his name was "Kenneth Jackson" (Docket No. 4, Judicial Hearing Officer Report at second unnumbered page). Niagara Falls police detectives then created a photo array containing photographs of six black males. Inadvertently, two pictures of petitioner (one from this current arrest identified as "Kenneth Jackson" and another from a prior arrest) were included in the six-photograph array (id.).

Approximately eleven days after the bank robbery, Niagara Falls police detective showed a photo array of six photographs of African-American men with some facial hair and short hair to witness Warez Abdullah (Wade Hearing Tr., June 12, 2002, at 33-36). Petitioner's photographs were photographs one and five within this array, with photograph one listed as "Kenny [or Kenneth] Jackson" (id. at 42, 51, 58; Docket No. 4, Am. Pet., at 7A), and the man depicted in

2

photograph five had a salt and pepper beard (see Wade Hearing Tr., June 12, 2002, at 40, 41). Abdullah selected a photograph, photograph five, that of petitioner (Wade Hearing Tr., June 12, 2002, at 35). While Abdullah was looking at the array, the detective checked and noted that the men depicted in photographs one and five appeared to have the same features, but the detective was not aware that "Kenneth Jackson" (photograph one) was the same person as petitioner (photograph five) (id. at 43).

Another detective showed this same array to Ronald Pennesi, who saw a man wearing a red bandana running from the area of the bank, four days after the robbery and Pennesi said that, "if he had to guess," he would choose photograph five (id. at 45-48; see Docket No. 4, Pet'r Memo. at 8). That detective then showed this array to another witness, cab driver David Dufresne, who also chose photograph five (Wade Hearing, June 12, 2002, at 50; Docket No. 4, Pet'r Memo. at 8).

A third detective showed four photo arrays to teller-witness Cherrie Massaro, who did not pick anyone from the first three arrays but selected photos from the fourth array (which contained both photographs of petitioner) (Wade Hearing, June 12, 2002, at 52-57, 59; Docket No. 4, Am. Pet. at 7B). Massaro picked photograph five (Wade Hearing Tr., June 12, 2002, at 56-68). Another teller-witness, Carmelita Martin, was also shown the same four arrays and could not identify anyone from the first three arrays. Ms. Martin was not sure between photographs one and five from the fourth array as being the person (id. at 62, 64, 66).

*Lineup*

On March 22, 2002, petitioner appeared in Niagara Falls City Court for his arraignment. He was dressed in the orange county jail jumpsuit and was shackled. Also present in court were three women who saw petitioner being escorted into the courtroom and being arraigned. Defense counsel assumed that those women would be witnesses in an upcoming lineup containing petitioner. (Docket No. 4, DiMillo Aff. ¶¶ 4-8, sworn to Mar. 26, 2002.) Petitioner and defense counsel could not identify these women but sought a hearing to determine whether or not they would be witnesses in a line up (Mar. 27, 2002, hearing Tr. at 4). The court denied petitioner's request for a hearing prior to conducting the lineup, concluding that petitioner was putting the "cart before the horse" and contentions about these potential witnesses seeing him in prison garb and shackles prior to the lineup could be raised later in a <u>Huntley</u> hearing or at trial to dilute the impact of the identification but should not preclude the lineup taking place (Docket No. 4, Am. Pet. at 8A; Mar. 27, 2002, hearing Tr., at 5-6).

On April 24,[2] 2002, a lineup was conducted in Niagara County Jail, with prosecution and defense counsel present. Defendant was with five other black males in the lineup, with counsel assisting in identifying the filler members of the lineup from a pool of approximately eleven possible participants. Six witnesses then observed the lineup. (<u>Id.</u> at third unnumbered page.)

Petitioner argued before the state court following the <u>Wade</u> hearing that one witness knew two of the fillers (<u>see</u> Docket No. 4, Decision & Order at third unnumbered page; <u>see</u> Docket

---

[2]The Judicial Hearing Officer states that the lineup occurred on April 18, 2002, Docket No. 4, Judicial Hearing Officer Report at third unnumbered page, but testimony during the <u>Wade</u> hearing had the lineup occurring on April 24, 2002, Tr., June 12, 2002, at 7; Tr., June 18, 2002, at 4, 10, 41.

No. 4, Pet'r Memo. at 23). William Graham, one of the fillers, testified at petitioner's Wade hearing that he knew witness Carmelita Martin from their neighborhood on the east side of Niagara Falls (Wade Hearing Tr., June 18, 2002, at 41-42). Graham also testified that his brother was also in the lineup (id. at 42, 47 (Graham in position 3 and his brother in position 6 in the lineup)) and that Ms. Martin knew his brother as well (id. at 42). Graham brought the fact that he knew Ms. Martin to the attention of defense counsel and petitioner after the lineup (id. at 44-45). Petitioner was in position 5 in the lineup (Wade Hearing Tr., June 12, 2002, at 17).

A Wade hearing was conducted on June 12 and 18, 2002, before a judicial hearing officer (see generally Wade Hearing Tr., June 12, 2002; Wade Hearing Tr., June 18, 2002). The judicial hearing officer found that the photo array was not suggestive and that the subsequent lineup also was not suggestive (Docket No. 4, Judicial Hearing Officer Report at third unnumbered page). He also found that the lineup described above was conducted properly and that the other males selected for the lineup had many similar characteristics as petitioner (id.). The officer recommended denying petitioner's motion to suppress the identification evidence (id. at fourth unnumbered page). The Niagara County Court adopted the findings of this report and ruled (applying New York law) that the photo array and the lineup were not unduly suggestive (Docket No. 4, Decision & Order, Aug. 16, 2002, at first unnumbered page). The court held that, reviewing the totality of circumstances, petitioner's lineup was not unduly suggestive despite the fact that one witness knew two of the fillers (id. at third unnumbered page, citing People v. Gaddy, 209 A.D.2d 430, 431, 618 N.Y.S.2d 462, 463 (2d Dep't 1994), leave denied, 84 N.Y.2d 1031, 623 N.Y.S.2d 187 (1995); People v. Rodriguez, 124 A.D.2d 611, 507 N.Y.S.2d 756 (2d Dep't 1986)). The Fourth Department affirmed, holding that the fact that one of six witnesses

5

knew some of the fillers did not render that lineup unduly suggestive, People v. Diggs, 19 A.D.2d 1098, 1099, 796 N.Y.S.2d 803, 804 (4th Dep't) (citing People v. Norris, 122 A.D.2d 82, 84, 504 N.Y.S.2d 491, 492 (2d Dep't), leave denied, 68 N.Y.2d 916, 508 N.Y.S.2d 1037 (1986); Gaddy, supra), leave denied, 5 N.Y.3d 787, 801 N.Y.S.2d 808 (2005).

*Conviction and Sentencing*

On March 27, 2003, petitioner was convicted of two counts of robbery in the first degree, one count of obstructing governmental administration in the second degree, in Niagara County Court (see Docket No. 1, Pet., at 1). Petitioner was sentenced as a second violent felony offender to a determinate sentence of fifteen years and to one year for the obstruction charge, with these sentences running concurrently (see Docket No. 8, Resp't Memo. at first unnumbered page).

*Appeal*

Petitioner appealed his conviction to the New York State Supreme Court, Appellate Division, Fourth Department, and that court affirmed the conviction, People v. Diggs, 19 A.D.3d 1098, 796 N.Y.S.2d 802 (4th Dep't), reargument granted and as amended, 21 A.D.3d 1438, 801 N.Y.S.2d 551 (4th Dep't 2005). Pertinent to this Petition, the Fourth Department applied the New York standard for suggestiveness and held that the photo array containing two photographs of petitioner (one taken from an earlier arrest, 21 A.D.3d 1438, 801 N.Y.S.2d 551) was not unduly suggestive, given "the unique circumstances of this case," 19 A.D.3d at 1098-99, 796 N.Y.S.2d at 803 (citing People v. Robert, 184 A.D.2d 597, 598, 585 N.Y.S.2d 445, 446 (2d Dep't), leave denied, 80 N.Y.2d 933, 589 N.Y.S.2d 861 (1992)). The court also held that the subsequent lineup was not unduly suggestive, Diggs, supra, 19 A.D.3d at 1099, 796 N.Y.S.2d at

803.  Leave to appeal to the New York State Court of Appeals was denied, People v. Diggs, 5 N.Y.3d 787, 801 N.Y.S.2d 808 (2005).

*Habeas Petition*

Petitioner now raises two objections to his conviction, the suggestiveness of the photo array and the suggestiveness of the lineup.  Petitioner argues that the photo array was unduly suggestive because it contained two pictures of him out of six photographs shown.  Petitioner also contends that the subsequent lineup was suggestive because three witnesses (possibly the bank employees) may have seen petitioner in jail garb and shackles in a city court proceeding prior to the lineup.  Defense counsel requested a hearing relative to this issue, further setting out in an affidavit the descriptions of the three women who were present in city court when petitioner was dressed in jail attire (Docket No. 4, DiMillo Responding Aff.).  The court denied petitioner's request for a pre-lineup hearing and denied petitioner's motion to adjourn the lineup (see Docket No. 4, Am. Pet., at 8A).  Five of the six witnesses picked petitioner from the subsequent lineup (id.).

Petitioner objects to the lineup, despite defense counsel's role in selecting the fillers for the lineup, because petitioner was the only one in the lineup with a salt and pepper beard (id. at 8B) and petitioner was standing between one of the tallest and one of the shortest fillers (id.).  None of the fillers were asked if they knew the witnesses although one of them did know Ms. Martin (id.; Wade Hearing June 18, 2002, at 41-42; Trial Tr. 355-56).  By having those fillers, Graham and his brother, in the lineup petitioner believes increased the likelihood that petitioner would be identified (Docket No. 1, Pet. at 8B).

## DISCUSSION

I.     Exhaustion

In the interest of comity and in keeping with the requirements of 28 U.S.C. § 2254(b), federal courts will not consider a constitutional challenge that has not first been "fairly presented" to the state courts. See Ayala v. Speckard, 89 F.3d 91, 94 (2d Cir. 1996), citing Picard v. Connor, 404 U.S. 270, 275 (1971); Daye v. Attorney General of New York, 696 F.2d 186, 191 (2d Cir. 1982) (in banc), cert. denied, 464 U.S. 1048 (1984). A state prisoner seeking federal habeas corpus review of his conviction must first exhaust his available state remedies with respect to the issues raised in the federal habeas petition. Rose v. Lundy, 455 U.S. 509 (1982). However, under 28 U.S.C. § 2254(b)(2), where appropriate the Court may deny the relief requested in the petition upon a review of the merits notwithstanding the failure of the applicant to exhaust state court remedies.

Based on the record before the Court, it appears that petitioner has exhausted his state court remedies. In any event, review of the claims asserted in the Petition is appropriate under § 2254(b)(2).

II.     Standard of Review

State court findings of "historical" facts, and inferences drawn from those facts, are entitled to a presumption of correctness. Matusiak v. Kelly, 786 F.2d 536, 543 (2d Cir.), cert. denied, 479 U.S. 805 (1986). (See also 28 U.S.C. § 2254(e)(1), which states that "a determination of a factual issue made by a State court shall be presumed to be correct.")

As amended by the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214 ("AEDPA"), 28 U.S.C. § 2254(d) provides that a habeas corpus

petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of that claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

The habeas corpus petitioner shall have the burden of rebutting the presumption of correctness by clear and convincing evidence. The presumption of correctness attaches to findings both by state trial courts and by state appellate courts. Smith v. Sullivan, 1 F. Supp. 2d 206, 210-11 (W.D.N.Y. 1998) (Larimer, Ch.J.); Nevius v. Sumner, 852 F.2d 463, 469 (9th Cir. 1988), cert. denied, 490 U.S. 1059 (1989). As noted by then-Chief Judge Larimer in Smith, "the new version of § 2254(d) has clearly raised the bar for habeas petitioners, placing on them the burden to show by clear and convincing evidence that the state court's decision was defective in some way." Smith, supra, 1 F. Supp. 2d at 211.

Prior to the enactment of the AEDPA, § 2254(d) provided that a state court "determination after a hearing on the merits of a factual issue ... shall be presumed to be correct," unless certain specified exceptions existed. When it enacted AEDPA, Congress changed the language dealing with the presumption of correctness of state court findings of fact and moved it to § 2254(e), and also added the current version of § 2254(d). The amended statute "requires federal courts 'to give greater deference to the determinations made by state courts than they were required to do under the previous law.'" Ford v. Ahitow, 104 F.3d 926, 936 (7th Cir.1997)

(quoting Emerson v. Gramley, 91 F.3d 898, 900 (7th Cir. 1996), cert. denied, 520 U.S. 1122 (1997)); see also Houchin v. Zavaras, 107 F.3d 1465, 1470 (10th Cir.1997) ("AEDPA increases the deference to be paid by the federal courts to the state court's factual findings and legal conclusion").

III.     Unduly Suggestive Photo Array

Pre-trial identification must be free of suggestiveness that could lead to misidentification to meet due process standards, see Neil v. Biggers, 409 U.S. 188, 196 (1972); Manson v. Brathwaite, 432 U.S. 98, 99, 114 (1977).  "The 'central question,' however, was 'whether under the "totality of the circumstances" the identification was reliable even though the confrontation procedure was suggestive,'" Brathwaite, supra, 432 U.S. at 106 (quoting Biggers, supra, 409 U.S. at 199)).  The Biggers Court considered a seven-month delay between the offense and the display of the array and held that there was no substantial likelihood of misidentification and allowed the identification evidence to go forward, Biggers, supra, 409 U.S. at 201.

In Simmons v. United States, 390 U.S. 377, 384 (1968), the Supreme Court held that convictions based on eyewitness identifications at trial following a pretrial identification by photographs will be set aside only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.  The Simmons Court found that a photographic pretrial identification was not unnecessarily suggestive and conducive to misidentification as to deny the defendant's due process or to require reversal of his conviction, where (1) a serious felony had been committed, (2) the perpetrators were still at large, (3) inconclusive clues led to defendant, (4) it was essential

for FBI agents to swiftly determine whether they were on the right track, and (5) there was little chance that the procedure utilized led to misidentification. Id. at 384.

In order to successfully challenge the pretrial photo identification procedure, a habeas petitioner needs to demonstrate that the procedure was so suggestive as to create a very substantial likelihood of misidentification, Flynn v. Pennsylvania Dep't of Corrections, No. 91-7888, 1992 U.S. Dist. LEXIS 2561, at *9-10 (E.D. Pa. Mar. 3, 1992) (citing United States v. Dowling, 855 F.2d 114, 117 (3d Cir. 1988)).  The district court in Flynn applied the totality of the circumstances test "with particular attention paid to such relevant factors as the quality of the witness' original opportunity to view the criminal, her degree of attention, her level of certainty when confronted with the suspect or his image, and the length of time between the crime and the confrontation," id. at *10 (citing Dowling, supra, 855 F.2d at 117; Biggers, supra, 409 U.S. at 199-200; Brathwaite, supra, 432 U.S. at 114-16).  "The fairness of a photo array depends on a number of factors, including the size and contents of the array and the manner in which it is presented to the eyewitness," Peace v. Scully, No. 91 Civ. 5771, 1992 U.S. Dist. LEXIS 4754, at *7 (S.D.N.Y. Apr. 13, 1992); see United States v. Maldonado-Rivera, 922 F.2d 934, 974 (2d Cir. 1990), cert. denied, 501 U.S. 1233 (1991).

Applying that standard, the Flynn court denied habeas relief and found that the photo array with two pictures of that petitioner and multiple pictures of other black males was "free from undue suggestiveness," Flynn, supra, 1992 U.S. Dist. LEXIS 2561, at *16, *11; see also Peace, supra, 1992 U.S. Dist. LEXIS 4754, at *7-8 (photo array with petitioner only bearded subject found not to be unduly suggestive).

In a civil rights action, one police practices expert testified that there is no legitimate reason to show two pictures of the same person in one photo array, "showing two pictures of the same person in different photo arrays might cause the victim to make an identification based upon seeing the picture twice rather than remembering the actual perpetrator; separate photos of the same person in one photo array would be suggestive; and there is no legitimate reason to, and that he would never show two photo arrays with a picture of the same person," Mayes v. City of Hammond, 442 F. Supp. 2d 587, 604 (N.D. Ind. 2006) (civil rights action). The defendant officer testified that the only legitimate reason to show multiple pictures of the same suspect is if the officer believed that the identification was wrong in an attempt to confirm the identification, id. at 604-05. On the summary judgment motion, the district court in Mayes found that plaintiff raised an issue of material fact whether the municipal defendants were liable for inadequately supervising the police officers who conducted the impermissibly suggestive photographic identification process where multiple pictures of the plaintiff were shown, id. at 646, 641.

As noted by petitioner as not binding on this Court (Docket No. 4, Pet'r Memo. at 15), one New York court has upheld an identification where two different photographs of the defendant were in successive arrays, People v. Gilbert, 295 A.D.2d 275, 276-77, 745 N.Y.S.2d 155, 156-57 (1st Dep't 2002) (victim did not identify defendant in first array but identified him in second array). See also State v. Williams, 60 Ill.2d 1, 9-11, 322 N.E.2d 819, 824 (1975) (three dissimilar photographs of defendant in array of eight, while normally undesirable as possibly becoming unduly suggestive, procedure held permissible) (cited by Petitioner, Docket No. 4, Pet'r Memo. at 16 n. 9).

Here, petitioner is not contending that the police intentionally placed two pictures of him in a photo array of six persons. Petitioner's photographs, under two different names, were inadvertently included in the array by one detective and not noticed until a second detective noted the similarities between the photographs. This differs from the practice noted in Dobbs v. Kemp, 790 F.2d 1499, 1506 (11th Cir. 1986), where use of multiple pictures of the defendant was a calculated method of narrowing the witnesses' choices. None of the witnesses identified petitioner from photograph five because they also saw photograph one. Two witnesses, in fact, were shown three other arrays with a total of eighteen photographs; as to these witnesses, the risk of misidentification is reduced. The witnesses saw the array days after the robbery. Thus, the totality of the circumstances here regarding this array shows that it was not unduly or impermissibly suggestive, despite the two photographs of petitioner and this claim for habeas relief should be **denied**.

IV.     Unduly Suggestive Line up

Petitioner next claims that he was deprived of his federal constitutional right to a fair trial and due process by the state court's failure to conduct a hearing regarding several witnesses who may have viewed him during a city court appearance prior to an unduly suggestive lineup being conducted. He also objects to the conditions of the lineup, including at least one filler in the lineup being known by one of the witnesses.

First, petitioner claims that the trial court erred either in denying a hearing before his lineup to consider whether the bank witnesses could recognize him from a prior court proceeding rather than from their recollection of the robbery or in not adjourning the lineup. He also objects to being observed by these witnesses in shackles at the city court proceeding, analogizing it to the

13

prohibition of shackling a defendant during his trial, cf. Deck v. Missouri, 544 U.S. 622, 627-29 (2005) (Docket No. 4, Pet'r Memo. at 21-22; Docket No. 11, Pet'r Reply Memo. at 4).

As with the photo array identification, the central question is whether the lineup is reliable even though the confrontation procedure was suggestive when viewing the totality of circumstances surrounding the lineup, see Brathwaite, supra, 432 U.S. at 104. This is similar to the standard applied by both the Niagara County Court and the Fourth Department in reviewing petitioner's contentions when these courts applied New York law, see Diggs, supra, 19 A.D.3d at 1099, 796 N.Y.S.2d at 804.

    A.    Pre-Lineup Hearing

The Supreme Court held that a judicial determination (outside the presence of jury) of the admissibility of identification evidence often may be advisable and, in some circumstances, constitutionally necessary. The Court, however, held that a state court is not constitutionally compelled to conduct a such a hearing outside the presence of a jury whenever a defendant contends that a witness' identification of him was arrived at improperly. Watkins v. Sowders, 449 U.S. 341, 349 (1981).

Petitioner did not identify a Supreme Court precedent for conducting such a hearing prior to the lineup (see Docket No. 8, Resp't Memo. at fourteenth unnumbered page), only suggesting that Watkins, stating that holding a hearing regarding identification evidence before trial, was preferred and sometimes constitutionally necessary, id. at 343, 349 (Docket No. 11, Pet'r Reply Memo. at 5). Watkins involved whether an admissibility ruling on the identification of the petitioner would take place outside of the presence of the jury, and the Court rejected a per se rule requiring such proceedings in all cases, id. at 349.

Petitioner here, however, wanted a hearing <u>before</u> the identification process could begin arguing that the witnesses were tainted by viewing the defendant in prison garb and in shackles before the lineup. But the Supreme Court has not recognized the right to a pre-lineup hearing. This is akin to creating a <u>per se</u> rule requiring evidentiary hearings on identifications that the <u>Watkins</u> Court expressly declined to require. Respondents also note that petitioner had a <u>Wade</u> hearing and is complaining only about its timing relative to the lineup (Docket No. 8, Resp't Memo. at fifteenth unnumbered page). At that <u>Wade</u> hearing, petitioner could have subpoenaed the three female witnesses to determine if any of them were in Niagara Falls City Court for petitioner's arraignment and, if so, whether seeing him there in a prison jumpsuit and shackles affected their lineup identification of petitioner. Or, as suggested by the trial court in denying the pre-lineup hearing, petitioner could have cross-examined these witnesses (either in a <u>Huntley</u> hearing or at trial) to dilute the impact of the identification (<u>see</u> Mar. 27, 2002, hearing Tr. at 5). Furthermore, this involved three of five witnesses who picked petitioner out of the lineup.

Under 28 U.S.C. § 2254(d), this Court's habeas review is limited to when the state court applied a contrary or unreasonable application of clearly established Supreme Court precedent. Petitioner relies upon precedent upholding a defendant's right to confront witnesses, <u>see</u> <u>Chambers v. Mississippi</u>, 410 U.S. 284, 295 (1973), but no precedent requiring the defendant to confront the witness <u>before</u> the proceeding by confrontation prior to the lineup (<u>cf.</u> Docket No. 4, Pet'r Memo. at 21). Absent a clear precedent in support of this right, petitioner's claim for habeas relief on this basis should **fail**.

B.      Suggestiveness and Problems with Lineup

As for petitioner's argument that he should not have been shackled for the preliminary proceeding in city court, Deck v. Missouri is distinguishable.  That case involved a capital defendant who was shackled during sentencing and the Court held that such visible shackling was prohibited in both the guilt and penalty phases unless justified by an essential state interest (for example, courtroom security), 544 U.S. at 624.  Here, petitioner seeks to extend this prohibition to preliminary proceedings not before the ultimate trier of fact (Niagara Falls City Court as opposed to Niagara County Court where petitioner was tried) on the chance that witnesses to the crime may be present in the courtroom.  The Deck Court, citing English common law authorities, noted that such a prohibition did not apply to "'the time of arraignment' or like proceeding," id. at 626 (quoting 4 W. Blackstone, Commentaries on the Laws of England 317 (1769)); see also id. at 344, quoting Illinois v. Allen, 397 U.S. 337 (1970) (use of shackles and gag during a trial as a last resort); Holbrook v. Flynn, 475 U.S. 560, 568-69 (1986) (use of shackles during trial).  The concern expressed by the Supreme Court in shackling a defendant during his trial is the impression such measures may have on the jury, see Flynn, supra, 475 U.S. at 568-69; Allen, supra, 397 U.S. at 344.  Those cases did not address the potential taint of a witness seeing the alleged perpetrator in prison garb and shackles.  Further, petitioner did not identify the three witnesses in the Niagara Falls City Courtroom that later viewed the lineup or question them at trial as to what they saw (see Docket No. 8, Resp't Memo. at fifteenth unnumbered page n.68), although at the time of the arraignment and at the argument of petitioner's motion for a hearing on these women petitioner did not know who they were (see Mar. 27, 2002, hearing Tr. at 4).

16

The chief problem with petitioner's lineup was the fact that one filler, Graham, knew one of the witnesses, Martin. Thus, Martin could eliminate at least one of the six in the lineup in attempting to identify the bank robber. Petitioner complains that Graham's brother was also a filler in this lineup and that Martin knew him as well, further increasing the chance that Martin would identify petitioner as the suspect. Nevertheless, four of the five other witnesses identified petitioner without any alleged prior knowledge of the fillers.

Petitioner next complains about the physical discrepancies within the lineup (Docket No. 4, Pet'r Memo. at 23). But defense counsel participated in selection of the fillers and did not object to the limited number of men in the pool or about the resemblance of the fillers to petitioner. Respondent counters that the trial court found that the lineup was not unduly suggestive and that this finding was upheld on appeal (Docket No. 8, Resp't Memo. at sixteenth unnumbered page; see Docket No. 4, Decision and Order, Aug. 16, 2002, at 3). Respondent points to the fact that six witnesses viewed three lineups and all identified petitioner (Docket No. 8, Resp't Memo. at sixteenth unnumbered page). From the totality of the circumstances here, petitioner's lineup was not unduly suggestive. One witness, in fact, failed to identify him, while other witnesses picked petitioner out despite one other being familiar with two of the five fillers.

Thus, petitioner should be **denied** habeas relief on this ground.

## CONCLUSION

Based on the above, it is recommended that the Amended Petition (Docket No. 4) be **DENIED**.

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby ordered that this Report & Recommendation be filed with the Clerk of the Court and that the Clerk shall send a copy to the Report & Recommendation to all parties.

**ANY OBJECTIONS to this Report & Recommendation must be filed with the Clerk of this Court within ten(10) days after receipt of a copy of this Report & Recommendation in accordance with 28 U.S.C. § 636(b)(1), Fed. R. Civ. P. 72(b) and W.D.N.Y. Local Civil Rule 72.3(a)(3).**

**FAILURE TO FILE OBJECTIONS TO THIS REPORT & RECOMMENDATION WITHIN THE SPECIFIED TIME OR TO REQUEST AN EXTENSION OF SUCH TIME WAIVES THE RIGHT TO APPEAL ANY SUBSEQUENT DISTRICT COURT'S ORDER ADOPTING THE RECOMMENDATIONS CONTAINED HEREIN.** Thomas v. Arn, 474 U.S. 140 (1985); F.D.I.C. v. Hillcrest Associates, 66 F.3d 566 (2d Cir. 1995); Wesolak v. Canadair Ltd., 838 F.2d 55 (2d Cir. 1988).

The District Court on de novo review will ordinarily refuse to consider arguments, case law and/or evidentiary material which could have been, but was not, presented to the Magistrate Judge in the first instance.  See Patterson-Leitch Co. Inc. v. Massachusetts Municipal Wholesale Electric Co., 840 F.2d 985 (1st Cir. 1988).

Finally, the parties are reminded that, pursuant to W.D.N.Y. Local Civil Rule 72.3(a)(3), "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority."  **Failure to comply with the provisions of Rule 72.3(a)(3) may result in the District Court's refusal to consider the objection.**

So Ordered.

/s/ Hugh B. Scott
Hon. Hugh B. Scott
United States Magistrate Judge

Buffalo, New York
May 30, 2007